UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 11-3491 (DWF/FLN)

Reino Barry Olson,

        Plaintiff,

    v.                       **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant

—————————————————————————

Carol Lewis, Esq., for Plaintiff

David W. Fuller, Assistant United States Attorney, for Defendant

—————————————————————————

    Plaintiff Reino Barry Olson seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who found Plaintiff was not disabled from his alleged onset date of January 27, 2007 through the date of the ALJ's decision, July 9, 2010. The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g). The parties submitted cross-motions for summary judgment. [Doc. Nos. 17, 24.] For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

## I.   INTRODUCTION

Plaintiff filed applications for disability insurance benefits and supplemental security income on November 9, 2007, alleging a disability onset date of January 27, 2007.[1] (Tr. 207-14.) His applications were denied initially and upon reconsideration. (Tr. 131-35, 140-45.) He requested a hearing before an ALJ, and the hearing was held on March 26, 2010. (Tr. 87-111.) The ALJ denied Plaintiff's applications for benefits on July 9, 2010. (Tr. 11-31.) The Appeals Council then denied Plaintiff's request for review. (Tr. 1-6.) Plaintiff filed a complaint for judicial review in this Court on December 2, 2011. The matter is now before this Court on cross-motions for summary judgment.

## II.   STATEMENT OF FACTS

### A.   Medical Evidence

Plaintiff filed a prior claim for Social Security disability benefits that was denied on January 26, 2007. (Tr. 112-126.) Therefore, the Court will only briefly summarize the prior medical records. Plaintiff has a history, since the 1990s, of low back pain with radicular symptoms into his legs, treated with Neurontin and Tramadol. (Tr. 363.) He also has chronic right ankle pain from an accident in 1989, which required ORIF[2] surgery. (*Id.*) Plaintiff's primary care provider, Physician Assistant Dane Durdall, gave Plaintiff permanent work restrictions of no walking greater than 200 feet, no climbing greater than two flights of stairs, no repetitive bending of his back, and no lifting greater than forty pounds or twenty pounds repetitively. (Tr. 365.) The walking and climbing restrictions were based on Plaintiff's subjective complaints. (Tr. 366-67.) Plaintiff also has a history

---

[1] The Court will cite the Administrative Record [Doc. No. 16] as "Tr."

[2] ORIF, open reduction and internal fixation, is a type of surgery used to fix broken bones, using screws, plates, rods or pins to hold the broken bone together. *Open Reduction and Internal Fixation Surgery,* NYU Langone Medical Center available at http://www.med.nyu.edu/content?ChunkIID=539804

of alcohol abuse and a criminal record that made it difficult for him to obtain or hold a job. (Tr. 612-13.) He was treated for depression, anxiety and possible ADHD. (Tr. 594.) In November 2006, Plaintiff was a student, and his alcohol use was his main reason for missing classes. (Tr. 592.) His depression was well-controlled but he tended to get angry when drinking. (*Id.*) His anxiety was not interfering with his life as much as it previously had been. (*Id.*) Plaintiff enjoyed riding his bike, watching television, playing darts and playing pool. (Tr. 388-89.)

After the alleged onset date of January 27, 2007, Plaintiff saw Durdall in February 2007 for right shoulder and left elbow pain. (Tr. 396-97.) Plaintiff's shoulder pain was present for more than five years, and he wanted an injection for pain relief. (*Id.*) He had a constant dull ache that was worse with reaching. (*Id.*) On examination, his joint was not tender but tests were positive for impingement. (*Id.*) About ten days later, Plaintiff asked Durdall to complete disability paperwork. (Tr. 399.) Durdall noted Plaintiff was studying drafting as a full-time student at St. Cloud Technical School, but he was not a good candidate for employment; he was in school to occupy and better himself. (*Id.*)

Plaintiff was treated for shoulder and elbow pain at least monthly from March through August 2007. (Tr. 401-12.) His treatment included physical therapy, chiropractic care, Tylenol #3, Darvocet or Tramadol, and cortisone injections. (*Id.*) Plaintiff had brief improvement after shoulder and elbow injections. (Tr. 401-05.) That summer, Plaintiff was in a fight, his jaw was broken and had to be wired shut. (Tr. 409-10.) In September and October 2007, Plaintiff was treated for right knee pain. (Tr. 359, 413-14, 425-26.) X-rays showed mild patellofemoral degenerative changes, and conservative treatment was recommended. (Tr. 425-26.)

Plaintiff continued to complain of right shoulder and left arm pain in October 2007. (Tr. 415-16.) Durdall hoped that if Plaintiff was consistent with physical therapy, he would not need further injections. (Tr. 415-16.) Plaintiff canceled or failed to show for many physical therapy appointments at NovaCare Rehabilitation between 2004 and 2007. (Tr. 472-73.) In November 2007, Durdall supported Plaintiff's claim for social security disability benefits, stating "[i]t is my opinion that Reino will never be able to sustain any meaningful job placement at this stage in his life. The last attempt that Reino had with work lasted little more than one month in December of 2004. The factors that go into this opinion are multifactorial but when looked at as a whole I do not see any lasting ability for Reino to maintain any employment." (Tr. 419.) He described Plaintiff's chronic back pain, ankle injury and tendinitis in the shoulders and elbow. (*Id.*)

Plaintiff saw Dr. Stephen Mariash at St. Cloud Orthopedic Associates in November 2007 for right ankle pain. (Tr. 424.) Dr. Mariash noted Plaintiff's pain was over the internal fixation of the ankle, and the hardware could be removed if the post traumatic arthrosis[3] worsened. (*Id.*)

On January 29, 2008, Dr. Cliff Phibbs at Disability Determination Services ("DDS") reviewed Plaintiff's medical records at the request of the SSA and completed a Physical Residual Functional Capacity Assessment form. (Tr. 481-88.) He opined that Plaintiff could lift fifty pounds occasionally and 25 pounds frequently; stand and walk or sit six hours each in an eight-hour workday; occasionally stoop, crouch and crawl; never climb ladders, ropes or scaffolds; and he was limited to occasional overhead work with the left arm. (*Id.*) On reconsideration of Plaintiff's social security disability claim by the SSA, Dr. George Salmi at DDS reviewed Plaintiff's medical records on August 12, 2008, and affirmed Dr. Phibbs' opinion. (Tr. 640-42.)

---

[3] Arthrosis, also called arthropathy, is any joint disease. *Dorland's Illustrated Medical Dictionary* 160 (Saunders Elsevier 31st ed. 2007).

Plaintiff saw Durdall and Dr. Scott Bammann in January 2008, primarily because he needed disability paperwork completed. (Tr. 500-04.) Durdall noted that physical therapy was helping Plaintiff's shoulder and elbow pain, but he had more substantial disabilities with depression, anxiety, chronic low back pain, and loss of range of motion in the ankle. (Tr. 500.) He diagnosed Plaintiff with major depressive disorder, low back pain, nondependent alcohol abuse and unspecified drunkenness. (*Id.*) Plaintiff's work restrictions were unchanged from Durdall's previous county medical opinion forms. (Tr. 504.)

Plaintiff underwent an intake evaluation with a new therapist, Val Broste, on February 19, 2008. (Tr. 587-88.) Plaintiff reported that he wanted to work but felt that depression and his physical limitations prevented it. (Tr. 587.) He was attending school to give his life some structure. (*Id.*) He was moody and angry, with poor concentration, but somewhat better with Lexapro. (*Id.*) Plaintiff was unable to drive because he had seven DWIs, but he was drinking less. (*Id.*) Plaintiff's mental status examination was normal, but he scored in the range of moderate to severe depression on the PHQ-9.[4] (Tr. 588.) Broste diagnosed anxiety disorder NOS, nondependent alcohol abuse, major depressive disorder, and a GAF score of 41-50.[5] (*Id.*) On his next visit, Plaintiff said he thought he could finish school and start another study program, but he was skeptical that he could ever use his

[4] The Patient Health Questionnaire Depression Scale is a self-administered questionnaire designed to measure the severity of depression. A score of 15 or greater is major depression; and a score of 20 or greater is severe major depression. http://patienteducation.stanford.edu/research/phq.pdf

[5] The Global Assessment of Functioning Scale, a scale of 0 to 100, is used for reporting a clinician's judgment of an individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (American Psychiatric Association 4th ed. text revision 2000) ("DSM-IV-tr"). Scores between 41 and 50 indicate serious symptoms or any serious of social, occupational or school functioning. *Id.* at 34. Scores between 51 and 60 indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id.*

education to get a job.  (Tr. 586.)  His mental status examination was within normal limits.  (*Id.*)  Broste added personality disorder to Plaintiff's diagnoses.  (*Id.*)

Over the next few months in therapy, Plaintiff discussed his difficulty with chronic pain and his tendency to procrastinate and not get things done for school.  (Tr. 581-85.)  He talked about the role of his multiple girlfriends, whom he helped by doing handyman jobs.  (Tr. 582.)  He wanted to be more physically active, especially with riding his bike.  (Tr. 581.)  Plaintiff continued to support himself by buying, repairing and selling things, but he was less motivated to do so.  (Tr. 580.)  He would finish school the next Spring and hoped to sign up for another program of study.  (*Id.*)

In May 2008, Plaintiff had a recurrence of left elbow pain but had run out of insurance coverage for physical therapy for the year.  (Tr. 566-67.)  He had almost full improvement with a cortisone injection.  (Tr. 566.)  Plaintiff started seeing a new chiropractor in April 2008, and was treated through December 2009 for headaches, neck pain, shoulder pain, elbow pain, and low back pain.  (Tr. 657-75.)  On one occasion, Plaintiff complained of pain at a level of ten out of ten, but his chiropractor noted that in comparison to other individuals, Plaintiff's true pain level appeared to be between three or four out of ten.  (Tr. 659.)

Plaintiff underwent a consultative psychological examination with Dr. James Lewis on May 28, 2008.  (Tr. 571-75.)  Plaintiff described his reason for applying for disability:  "I have a combination of injuries that cause pain.  I can't do continuous work."  (Tr. 571.)  Plaintiff was 46-years old, five feet, five inches tall, and weighed 197 pounds.  (*Id.*)  He was divorced and had a 22-year old daughter.  (*Id.*)  Plaintiff had an eleventh grade education with some special education for ADHD and anxiety.  (*Id.*)  His last jobs were through a temporary agency in 2004.  (Tr. 572.)  His past work involved operating a forklift and working at five different car shops.  (*Id.*)  He had

headaches since his jaw was wired in 2007; constant low back pain since an accident in 1990; and past diagnoses of depression, anxiety, ADHD, polysubstance dependence, and problems with anger management. (*Id.*)

Plaintiff described his daily activities. (*Id.*) His interests were listening to music and reading materials for class. (*Id.*) He woke up between 7:30 and 8:00 am, watched television all day, rested one hour from 10:00 to 11:00 a.m., ordered his food to be delivered, washed some dishes, but rarely cleaned his apartment. (*Id.*) He went to bed at 11:00, and pain woke him every hour or so. (*Id.*) Plaintiff had girlfriends in the Twin Cities but had trouble getting along with them. (Tr. 573.) Plaintiff had DWIs in the past with numerous jail terms, the last in 2001. (*Id.*)

On mental status exam, Plaintiff was friendly and talkative. (*Id.*) The mental examination was normal but Plaintiff was restless due to ADHD and pain. (*Id.*) His energy was moderately low; and he described racing thoughts about relationships and past mistakes. (*Id.*) He reported trouble concentrating, remembering what he read, listening in class, listening to conversations, and with verbal instructions. (*Id.*) His mood was anxious and irritable with angry outbursts. (*Id.*) Medication had reduced his outbursts, crying spells, and thoughts of hurting others. (*Id.*) Dr. Lewis estimated Plaintiff's IQ as average. (*Id.*) Plaintiff said his elbow and shoulder pain were the most severe, but his low back pain could flare to ten out of ten in severity. (Tr. 574.) Dr. Lewis diagnosed depressive disorder, NOS; ADHD combined type; polysubstance dependence in remission; intermittent explosive disorder, and a GAF score of 55. (*Id.*) Dr. Lewis opined Plaintiff could remember and carry out two-step directions but had problems concentrating and staying on task; he could learn new information but verbal outbursts and irritability prevented him from holding a job long term; and Plaintiff was presently unable to tolerate the stress of the workplace. (Tr. 575.)

When Plaintiff saw his therapist on June 3, 2008, he said he was bored with school being out, but he was staying busy helping his mother, working for the family campground, helping girlfriends with household projects and fixing bikes. (Tr. 578.) He was struggling with back and shoulder pain, low energy, motivation, lack of direction, appetite disturbance and alcohol use. (*Id.*) After activity on some days, he could do nothing more than sit in a chair. (*Id.*) Because he was doing more activities that month, such as working on friends' cars, Plaintiff asked Durdall for an increase in Neurontin and a left elbow injection. (Tr. 778-79.) In July, Plaintiff was unable to tolerate the antidepressant Remeron, and was started on Klonopin because he was more irritable lately. (Tr. 875, 877-78.) He also remained on Wellbutrin and Neurontin. (Tr. 875.)

On July 21, 2008, Broste wrote a disability opinion letter for Plaintiff. (Tr. 619.) She said Plaintiff did not have a long attention span. (*Id.*) He reported that when he worked on a "fix-it project" he could only work a few minutes at a time, usually due to distraction of physical pain. (*Id.*) Broste opined that Plaintiff's personality was such that he is critical and intolerant of others, and he would not work well in a setting where he received regular direction, feedback or criticism or where he needed to work closely with others. (*Id.*) Broste also completed the "Medical Opinion Re Ability to Do Work-Related Activities (Mental)" form regarding Plaintiff for the SSA. (Tr. 620-21.) She indicated that Plaintiff would have poor or no ability to do the following: maintain attention for a two- hour segment; sustain an ordinary routine without special supervision; perform at a competitive rate; and accept instructions and respond appropriately to criticism from supervisors. (*Id.*)

Broste also indicated Plaintiff would have a fair ability to do the following: understand, remember and carry out detailed instructions; set realistic goals and make independent plans; work in coordination with or proximity to others without being unduly distracted; interact appropriately

with the general public; maintain basic standards of neatness and cleanliness; ask simple questions; get along with coworkers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal stress; and be aware of normal hazards. (*Id.*) She opined that Plaintiff would have a good ability to understand, remember and carry out very short and simple instructions, remember work-like procedures; make simple decisions; and behave in an emotionally stable manner. (*Id.*) She explained that pain and anxiety impaired Plaintiff's focus and productivity; and he was irritated by most people. (Tr. 621.) She thought he would miss work more than three days per month. (*Id.*)

Dr. Russell Ludeke reviewed Plaintiff's social security disability file on August 12, 2008, and completed a Psychiatric Review Technique Form regarding Plaintiff for the SSA. (Tr. 622-35.) Dr. Ludeke indicated that Plaintiff had an organic mental disorder, an affective disorder, and an anxiety related disorder that resulted in mild restriction in activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence or pace. (Tr. 622, 632.) Dr. Ludeke rejected Dr. Lewis' statement that Plaintiff could not tolerate the stress of the workplace because it was inconsistent with the evidence. (Tr. 634.) Dr. Ludeke's opinion was that Plaintiff could concentrate on, understand, remember and carry out routine, repetitive, 3-4 step tasks with adequate persistence and pace; limited to superficial contact with coworkers and the public; he had the ability to handle non-authoritarian supervisory styles; and Plaintiff could handle the stress of a routine, repetitive, 3-4 step work setting. (Tr. 638.)

Meanwhile, Plaintiff's therapist noted that Plaintiff was getting by financially with his student loan money and buying, repairing and selling bikes. (Tr. 873.) His minimal depression and mild anxiety were treated with Klonopin. (*Id.*) The next month, Plaintiff's mood was fairly good. (Tr.

871-72.)  He was busy with school, hobbies, and renovating a car for his daughter.  (Tr. 871.)  In October 2008, Plaintiff was doing well in school and drinking moderately.  (Tr. 868.)  He pushed himself to do things he enjoyed and then suffered pain and exhaustion.  (*Id.*)  He was moderately depressed and more irritable when in pain.  (*Id.*)  He continued to have cortisone shots in his shoulders for pain with reaching and lifting.  (Tr. 772-73.)  The next month, Plaintiff told Broste he was not truthful in his relationships with women but did not see himself living any other way.  (Tr. 866-67.)  His pain was a little better, and his alcohol use was moderate.  (Tr. 866.)  Later that month, his shoulder pain increased, but x-rays of the right shoulder indicated no substantial change since 2004, although space between the AC joint showed the possibility of previous separation.  (Tr. 766-70.)  He was treated with Darvocet because his insurance would not pay for more physical therapy that year.  (Tr. 767, 769.)

Plaintiff described his anger problems in therapy on November 25, 2008.  (Tr. 864-65.)  His anger and irritability were triggered by girlfriends expecting too much of him or by frustration with using computers in class.  (Tr. 864.)  He realized part of his difficulty with employment was inability to get along with others.  (Tr. 865.)  Several weeks later, Plaintiff was using alcohol to sedate himself and sleep due to his shoulder pain.  (Tr. 860.)  Although he was frustrated with his unemployment, Broste noted Plaintiff had limited interest in making changes.  (Tr. 861.)

On December 18, 2008, Plaintiff exacerbated his shoulder pain in a car accident.  (Tr. 764-66.)  He suffered a whiplash type injury to his neck, and also had increased low back pain.  (Tr. 764.)  On examination, he refused to bring his right arm up to full extension but had full passive range of motion, some mild crepitance in the shoulder, fair neck range of motion, negative straight leg raise test, normal reflexes and no swelling.  (Tr. 765.)  A cortisone injection to his right shoulder gave him

some immediate relief. (*Id.*) A few weeks later, Plaintiff's shoulder pain was worse, even after physical therapy; and he also had neck, back and jaw pain. (Tr. 762.) The increased pain caused him severe depression. (Tr. 855.) He was coping by using alcohol. (*Id.*) He was less motivated to make money by repairing and selling things. (*Id.*) On examination by Dr. Shane Gustafson at St. Cloud Orthopedics Associates, Plaintiff had full range of motion of the cervical spine, no tenderness of the cervical or AC joint, full range of motion of the right shoulder, adequate muscle strength, but Hawkins and Neers tests were positive for rotator cuff impingement. (Tr. 745-46.) A CT scan of Plaintiff's right shoulder showed mild narrowing of the acromiohumeral space, and rotator cuff tear could not be ruled out, but there was no evidence of joint arthrosis. (Tr. 857.) Further scans with contrast were recommended. (Tr. 746, 857.)

On January 27, 2009, Durdall completed county disability paperwork for Plaintiff, indicating Plaintiff was restricted to lifting twenty pounds, walking 200 feet, climbing two flights of stairs, and no repetitive bending. (Tr. 650.) Durdall also completed a "Medical Opinion Re Ability to Do Work-Related Activities (Physical)" form regarding Plaintiff for the SSA that day. (Tr. 646-49.) He opined Plaintiff had the maximum ability to lift and carry ten pounds, and less than ten pounds frequently; stand and walk less than two hours in an eight-hour day, sit less than two hours in an eight-hour day; sit for five minutes before changing position; stand or walk ten minutes before changing position; walk around every five minutes; shift position at will; occasional neck movement; no repetitive foot controls or repetitive twisting, stooping, or crouching; climb no more than two flights of stairs, no climbing ladders; occasionally handle objects but never use fine finger movements; avoid all exposure to hazards and concentrated exposure to humidity and vibration; no crawling; and no closed environments. (*Id.*)

The next week, Broste noted Plaintiff was doing fairly well with his increased school hours, but he was dependent on a girlfriend for rides to school because he could not carry his laptop. (Tr. 849.) Plaintiff had cortisone injections in both elbows, in part due to pain from carrying his laptop. (Tr. 846-47.) Then, in follow up with Dr. Gustafson after having a CT arthrogram of his right shoulder, Dr. Gustafson suggested Plaintiff might need surgical intervention because he had a rather significant partial injury tear to the supraspinatus and some questionable labral pathology. (Tr. 740-44.) Plaintiff was treated in physical therapy, but discharged from NovaCare Rehabilitation on March 25, 2009 for noncompliance. (Tr. 676-710.) In April, Plaintiff said he would wait until the end of the summer to schedule shoulder surgery. (Tr. 737.) Dr. Schapp noted Plaintiff would not need surgery if his pain resolved. (*Id.*) On April 21, 2009, Plaintiff told Broste that his energy was low but he was resuming "some of his spring activities." (Tr. 833.) His mood was depressed, and his alcohol use did not appear to be excessive. (*Id.*)

Plaintiff was not getting pain relief in his left elbow from cortisone injections in April 2009. (Tr. 755-56.) An x-ray showed an arthritic type spur but no erosive changes. (Tr. 753-54.) On examination, Plaintiff had some tenderness but examination was otherwise normal. (*Id.*) At the end of April, Plaintiff told Dr. Rasmussen he had a lot of pain in his right shoulder but he had not scheduled surgery because he had some issues with his insurance. (Tr. 831.) Dr. Rasmussen diagnosed major depression in partial remission. (*Id.*)

Plaintiff had a CT scan of his cervical spine on June 17, 2009. (Tr. 825-26.) The scan showed moderate chronic degenerative changes at C5-6 and C6-7; mild central canal stenosis at C5-6; moderate to severe left neural foraminal narrowing; mild right C6-7 neural foraminal narrowing; moderate left and mild right C5-6 neural foraminal narrowing; left C7 neural impingement; chronic

hypertrophic facet joint arthrosis on the right at C2-3; mild to moderate right C2-3 neural foraminal narrowing; broad based disc herniations at C3-4 and C4-5 without significant central canal stenosis or significant neural foraminal narrowing; diffuse osteopenia/demineralization of visualized bones; and no evidence of compression fracture or deformity. (*Id.*)

Plaintiff's irritability increased that month. (Tr. 823-24, 829-30.) He was abrupt and rude with people who were buying things from him, and he took his irritability out on a girlfriend. (Tr. 823-24.) Many things annoyed him, and he felt justified in his rudeness. (Tr. 823.) In July, Broste noted that Plaintiff exhibited significant grandiosity regarding his relationships with multiple women. (Tr. 821.) He also seemed to be experiencing more depression, and was using alcohol on a regular basis. (*Id.*) Broste noted Plaintiff was not receptive to making any changes. (*Id.*)

On July 14, 2009, Plaintiff was evaluated at Central Minnesota Neurosciences for complaints of arm pain radiating to his fingers on the right hand. (Tr. 653-54.) Plaintiff attributed this to neck pain from his car accident in December 2008; and he said moving his head made it worse. (Tr. 653.) Plaintiff had chiropractic treatment with little relief. (*Id.*) He reported having ten alcoholic drinks per week, and occasionally smoking marijuana. (*Id.*) Plaintiff denied weakness, fatigue, joint pain, stiffness and muscle pain. (*Id.*) On examination, he had full range of motion of the neck; his cranial nerves were intact; memory was intact; gait was stable; Hoffman's and Babinski tests were negative; he had full left arm and hand strength; 4+ out of 5 right bicep strength; no tenderness to palpation; and normal reflexes throughout. (Tr. 654.) The next day Plaintiff had an epidural steroid injection and epidurography in his neck. (Tr. 655-56.) Later that month, Plaintiff had a right ankle x-ray, showing stable fixation and stable mild osteoarthritic change of the tibiotalar joints. (Tr. 749-50.)

In August, Durdall added a new work restriction to Plaintiff's county disability medical form, no lifting his left shoulder past shoulder height. (Tr. 806.)

At the end of August, Broste noted Plaintiff was back in school and still having relationship issues, using deception in his relationships and having difficulty getting along with people due to irritability and frustration. (Tr. 804.) Pain management was Plaintiff's biggest problem, and he continued to regularly use alcohol. (Tr. 805.) On September 1, 2009, Physician Assistant Brad Rutten opined Plaintiff should be seen in orthopedic surgery for his right elbow because his treatment with numerous cortisone injections was no longer appropriate. (Tr. 800-03.) Rutten noted that Plaintiff admitted to drinking a twelve-pack per week and five or more alcoholic drinks in a day. (Tr. 802-03.)

Plaintiff underwent a behavioral health intake at Health Partners with a new psychologist, Cheryl Bounds Spellacy, in October 2009. (Tr. 793-98.) Plaintiff reported the following concerns, stress, temper, chronic pain, relationship difficulty, agitation, aggression, anger, anxiety, difficulty with decision-making, depression, amotivation, mood swings, paranoia, self-centeredness, suspiciousness, alcohol use, drug use, weight issues, social withdrawal, poor attention/concentration, poor organization, impulsivity, excessive energy, fatigue, headaches, irresponsibility, procrastination, racing thoughts, poor self-care, sleep problems, and career and financial problems. (Tr. 793.) His PHQ-9 score was 14, indicating moderate depression. (*Id.*) His current substance use was marijuana and alcohol. (Tr. 796.) On mental status examination, Plaintiff was overly self-assured, motor activity was agitated and concentration was impaired. (Tr. 796-97.) Bounds Spellacy diagnosed

major depressive disorder, recurrent and moderate and anxiety disorder NOS, provisional narcissistic personality disorder, and assessed a GAF score of 50.[6] (Tr. 797.)

Plaintiff requested a refill of Tylenol #3 for his shoulder and elbow pain in November 2009. (Tr. 786-88.) He had recently failed to show for three appointments for an EMG. (Tr. 651.) Physician Assistant Jennifer Fuchs agreed to a one month refill but was concerned about treating Plaintiff with narcotics for chronic pain. (Tr. 787.) When Plaintiff had an x-ray of his right elbow on November 10, it was normal with no significant degenerative arthritis. (Tr. 736.) Dr. Kim Schapp at St. Cloud Orthopedic Associates diagnosed epicondylitis and thought the pain should resolve on its own. (*Id.*) In December, when Plaintiff was treated for a finger laceration sustained while using a saw, he requested more Tylenol #3 for his shoulder and elbow pain. (Tr. 781-82.) Dr. Flores gave Plaintiff a few tablets but told Plaintiff he needed to get narcotic refills from his primary care physician. (*Id.*)

On December 11, 2009, Plaintiff's therapist noted that his cognitive patterns suggested narcissism. (Tr. 783-84.) Plaintiff agreed that he lied by omission to his six girlfriends. (Tr. 783.) He used alcohol and prescription medications for pain management and to stave off boredom. (*Id.*) He was either unable or unwilling to engage in productive symptom reduction with his therapist, who recommended that he consult with another psychologist. (*Id.*) Bounds Spellacy diagnosed major depressive disorder, recurrent and moderate; narcisstic personality disorder; and a GAF score of 55. (Id.)[7] The next month, Bounds Spellacy referred Plaintiff to Dr. David Lesar to treat his chronic pain

---

[6] Spellacy recorded part of her diagnoses using DSM-IV-tr codes 296.32 and 300.00. *DSM-IV-tr* at 860-61.

[7] Spellacy indicated her diagnoses using DSM-IV-tr codes 296.32 and 301.81. *DSM-IV-tr* at 860, 862.

with biofeedback. (Tr. 881-82.) However, Plaintiff received a refill of Tylenol#3 to treat his left elbow and shoulder pain from Dr. Flores. (Tr. 883-84.) The next week, Plaintiff met with Dr. Lesar, who stated "[c]urrently he does seem as if he would like to be able to work more efficiently and for greater lengths of time, but is limited by somewhat disability and somewhat the circumstances that he finds himself in, because of his application for disability." (Tr. 879-80.) Plaintiff said he was not the type of person to sit around, and he did a lot of things like going to school, and work associated with buying and selling things. (Tr. 880.) Plaintiff acknowledged that stress aggravated his pain; and he wanted to manage it more effectively. (*Id.*)

### B. Administrative Hearing

Plaintiff testified to the following at the hearing on March 26, 2010. He is 48-years-old, divorced, lives alone, and has no children under age 18. (Tr. 89-90.) He has had seven DWIs and lost his driver's license. (Tr . 90.) He attends St. Cloud Technical College full-time, studying advertising communication and design, but only attends class five to seven hours a week. (Tr. 91.) He has been in school five years. (Tr. 93.) He had finished one college program, but it took almost twice as long as the two years it should have taken because he missed a lot of classes. (Tr. 102.) His last job was at a temporary agency in July 2004, driving a forklift. (Tr. 92.) The job ended because he called in sick too often. (Tr. 92-93.)

Plaintiff does not believe he can work full-time because any motion causes him discomfort. (Tr. 93.) He was in another car accident in December 2008, and it increased his problems. (Tr. 93-94.) Using a mouse with his right hand hurts his elbow. (Tr. 94.) He needs surgery on his shoulder for a rotator cuff tear. (*Id.*) His knee and ankle hurt if he carries any weight. (Tr. 95.) His ankle causes the most pain. (Tr. 103.) Plaintiff took Tramadol and Gabapentin for pain, and the medication

made him drowsy and nauseous. (Tr. 103-04.) He used a home traction device for his neck twice a week. (*Id.*) He sits in a recliner and has to change position frequently. (Tr. 104.) He cannot lift or hold anything with his hands because it hurts his shoulders. (Tr. 105.) He has a hard time carrying a book to school and has to switch hands. (Tr. 106.) He uses an ankle brace and elbow braces. (Tr. 105.)

Plaintiff has trouble getting along with people because he disagrees with them, and this caused him to be fired from jobs. (Tr. 106.) He also has trouble with attendance because he sees doctors frequently for pain. (Tr. 106.) He gets distracted and has trouble finishing tasks. (Tr. 107-08.) He handles stress by avoiding it or getting mad. (Tr. 108.) Plaintiff admitted that he drank, but not as much as he used to because of the medications he was taking. (Tr. 95.) He gave up marijuana one month ago because his doctor would not prescribe Tylenol #3 while he was using marijuana. (Tr. 96.)

Kenneth Ogren testified at the hearing as a vocational expert. (*Id.*) The ALJ posed a hypothetical question about the type of work a person could do if they had the restrictions imposed on Plaintiff by Physician Assistant Durdall on an SSA Form. (Tr. 96-97.) Ogren testified someone with those limitations could not perform any jobs. (Tr. 97.)

The ALJ based his next hypothetical question on a State medical form for general assistance. (Tr. 97.) The hypothetical individual could only: walk 200 feet, climb two flights of stairs, lift no more than twenty pounds, and no repetitive bending. (Tr. 98.) Ogren's answer was the same; there were no jobs to fit the hypothetical. (*Id.*) Then, the ALJ asked a hypothetical question based on the D.D.S. physicians' opinions. (*Id.*) The individual could handle the stress of routine, repetitive, three or four-step work with brief, infrequent and superficial contact with the public, co-workers and

supervisors; and with a medium physical functional capacity; never climb ladders, ropes or scaffolds; and limit overhead work to occasional on the left arm. (Tr. 98-99.) Ogren testified such a person could not perform Plaintiff's past relevant work but could perform other jobs such as hand packager,[8] gluer operator,[2] and food sorter.[2]

The ALJ then read the opinion letter of Val Broste, Exhibit 15F, and asked Ogren whether someone with the characteristics described by Broste could perform any of Plaintiff's past relevant work or any other work. (Tr. 99-101.) Ogren testified there were no jobs such a person could perform. (Tr. 101.)

### C. ALJ's Decision

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.

2. The claimant has not engaged in substantial gainful activity since January 27, 2007, the alleged onset date. (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3. The claimant has the following severe impairments: status post mechanical low back pain, status post ORIF ankle fracture, shoulder and elbow pain, tobacco abuse, numbness in fingers, depressive disorder, anxiety related disorder, and polysubstance dependence. (20 CFR 404.1520(c) and 416.920(c)).
   . . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[8] Dictionary of Occupational Titles ("DOT") Code 559.687-010, with 2,200 jobs in Minnesota.

[9] DOT Code 795.687-014, with 1,000 such jobs in Minnesota.

[10] DOT Code 734.687-082, with 1,200 such jobs in Minnesota.

. . .

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: lift/carry and push/pull 50 pounds occasionally and 25 pounds frequently; stand/walk about 6 hours during an 8-hour workday; sit about 6 hours during an 8-hour workday; climb and balance frequently; stoop, crouch, and crawl occasionally; unable to climb ladder, rope and scaffolds; occasional overhead work with the left arm; low stress, routine tasks, and brief superficial contact with others.
. . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
. . .

7.      The claimant was born on July 6, 1961 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
. . .

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act from January 27, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16-25.)

### III.   CONCLUSIONS OF LAW

#### A.        Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. 405(g); *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  *Moore ex rel Moore v. Barnhart*, 413 F.3d 718, 721 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision.  *Vandenboom v. Barnhart*, 421 F.3d 745, 749 (8th Cir. 2005).

#### B.        Discussion

Plaintiff makes three arguments in support of summary judgment.  First, he contends that he medically equals Listing 1.02, and the ALJ failed to fully and fairly develop the record at the third step of the evaluation.  Second, Plaintiff asserts the RFC finding is not consistent with the treatment record.  Third, Plaintiff argues the ALJ failed to properly weigh the medical opinions.  As a result of the ALJ's error at the fourth step of the evaluation, Plaintiff asserts the ALJ posed an improper

hypothetical question to the vocational expert and erred in relying on the expert's testimony to find Plaintiff not disabled. The Court will address Plaintiff's second and third arguments together under the fourth step of the disability evaluation performed by the ALJ.

### 1. Listing 1.02

At the third step of the disability evaluation, Plaintiff contends the ALJ failed to fully develop the record because he did not have a medical expert at the hearing testify about whether Plaintiff equaled Listing 1.02 for chronic joint pain. Furthermore, Plaintiff asserts he equals Listing 1.02 because when all of his impairments are considered, he cannot use his upper extremities effectively. The Commissioner responds that the ALJ properly relied on the opinions of State agency reviewing physicians, Drs. Phibbs and Salmi, in determining that Plaintiff did not medically equal a listed impairment. And, the Commissioner asserts Plaintiff does not medically equal Listing 1.02 because he did not prove he is unable to perform fine or gross movements effectively, which requires proof of an extreme loss of function of both upper extremities, including very serious interference with independently completing activities of daily living.

The ALJ specifically found that Plaintiff's physical impairments did not meet or medically equal Listing 1.02A or 1.02B but did not further explain this finding. (Tr. 16.) However, the ALJ gave the DDS physicians' opinions great weight based on supporting evidence in the record. (Tr. 23-24.) In January 2008, Dr. Phibbs reviewed the records in Plaintiff's social security disability file and completed a Physical Residual Functional Capacity Assessment form. (Tr. 481-88.) He limited Plaintiff to occasionally lifting fifty pounds and frequently lifting twenty-five pounds, with only occasional overhead work with the left arm. (Tr. 482-83.) Dr. Salmi reviewed Plaintiff's social security disability file in August 2008, and affirmed Dr. Phibbs' opinion. (Tr. 640-42.)

Medical equivalence to a listed impairment means the impairment(s) "is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a); *see Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citing 20 C.F.R. § 416.926(a) (1989)). An ALJ is not bound by a State agency medical consultant's opinion on medical equivalence, but "longstanding policy" requires the ALJ to receive a physician's opinion on equivalence into the record as expert opinion evidence. Social Security Ruling ("SSR") 96-6p, 61 Fed.Reg. 34,466, 1996 WL 374180 at *3 (July 2, 1996). "The signature of a State agency medical . . . consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician . . . has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Id.*

> When an administrative law judge or the Appeals Council finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant. However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:
>
> . . .
>
> *When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*Id.* at *3-4.

In this case, Drs. Phibbs and Salmi provided the necessary medical equivalence opinions at the initial and reconsideration levels, after which additional evidence was received into the record. (Tr. 481-88, 640-42.) The ALJ was required to obtain a medical expert opinion only if, in his

opinion, the additional evidence might have changed the State agency medical consultant's opinion on medical equivalence. *Carlson v. Astrue*, 604 F.3d 589, 595 (8th Cir. 2010). The ALJ did not seek a medical expert opinion to address the additional evidence, and the Court will review whether the ALJ's decision was based on substantial evidence in the record.

Listing 1.02B provides:

> Major dysfunction of a joint(s) due to any cause: Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> ...
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Part 404, Subpart P, Appendix 1, §1.02.

Section 1.00B2c provides:

> What we mean by inability to perform fine and gross movements effectively. Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00B2c.

Plaintiff alleged pain and received treatment for his shoulders and elbows. He was diagnosed with shoulder tendinitis, rotator cuff tear of the right shoulder, and epicondylitis. Plaintiff's treating physician assistant limited Plaintiff to lifting and carrying ten pounds occasionally and less than ten pounds frequently, occasionally handle objects but never use fine finger movements, and do not lift his left shoulder past shoulder height. (Tr. 646-49, 806). The listing requires involvement of a major joint of each upper extremity. There is no imaging evidence of joint space narrowing, bony destruction or ankylosis of Plaintiff's left shoulder, but there is x-ray evidence of an arthritic type spur on Plaintiff's left elbow. (Tr. 753-54). On the right arm, a CT scan also showed mild narrowing of the acromiohumeral space of Plaintiff's shoulder. (Tr. 857). Although these objective findings of Plaintiff's joints are minimal, for purposes of argument, the Court will assume these findings equal a major joint dysfunction of Plaintiff's upper extremities under the introductory paragraph of Listing 1.02. Therefore, the Court looks to whether Plaintiff established an inability to effectively perform fine or gross movements with his upper extremities under paragraph B of the listing.

The record does not contain evidence that Plaintiff was unable to perform the specific activities listed in § 1.00B2c, prepare a simple meal, feed oneself, take care of personal hygiene, sort and handle papers or files or place files in a cabinet at or above waist level. Furthermore, the record does not support limitations in similar activities. Although Plaintiff complained of pain with reaching and lifting, the only example of a limitation in his daily life was that he had difficulty carrying his laptop to school. He used his upper extremities for many activities including his schoolwork, performing all activities required to live alone, helping friends and family with handyman jobs and car repairs, and repairing things for the purpose of selling them. Based on this evidence, the Court

finds no reason the ALJ should have found medical equivalence or obtained medical expert testimony at the hearing on the issue of medical equivalence to Listing 1.02.

### 2. Residual Functional Capacity

Plaintiff asserts the ALJ erred by failing to the weigh the treating source opinions under all of the factors in 20 C.F.R. § 404.1527. Plaintiff further contends the ALJ's RFC finding is inconsistent with the records of his healthcare providers. In response, the Commissioner argues the ALJ properly gave greater weight to the State agency consulting physicians' opinions because the record as a whole supported their opinions and did not support the treating physicians' opinions. Particularly, the Commissioner cites evidence of mild examination results, improvement with conservative treatment, noncompliance and dishonesty, and the wide array of activities Plaintiff performed. The Commissioner contends the hypothetical question posed to the vocational expert contained the credible limitations supported by the record.

An ALJ should give a treating physician's opinion controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ can discount a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). If the ALJ does not give the treating physician's opinion controlling weight, she should consider the following factors in weighing the medical opinions: 1) type of relationship with physician; 2) supportability of the opinion; 3) consistency of the opinion with the record as a whole; 4) specialization; and 5) any factors brought to the ALJ's attention. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (citing 20 C.F.R.

§ 404.1527(d)).  "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."  *Id.* at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

"[A]n ALJ may not discount a claimant's allegation of disabling pain solely because the objective medical evidence does not fully support" the allegations.  *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (quoting *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003) (citation omitted)).  But an ALJ may discount subjective complaints "if there are inconsistencies in the evidence as a whole."  *Id.* (quoting *Strongson*, 361 F.3d 1072 (quoting *Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir. 2001)).  The ALJ need not methodically discuss each credibility factor, as long as she acknowledges and considers those factors.  *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).  The court will affirm the ALJ's credibility analysis when the ALJ, for good cause, expressly discredits a claimant's complaints of disabling pain.  *Goff,* 421 F.3d at 792.

Plaintiff asserts the record as a whole supports the treating physicians' opinions, and the Commissioner asserts the record as a whole supports the State agency physicians' opinions.  The Court agrees with the Commissioner because the objective evidence does not support the treating providers opinions, and the ALJ properly discounted Plaintiff's subjective complaints in determining Plaintiff's RFC.  It is true that the regulations create a preference for treating providers' opinions under 20 C.F.R.  §§ 404.1527(c), 416.927(c), but courts have upheld ALJ decisions to discount treating physician opinions where the record as a whole better supports a nontreating or even a nonexamining physician's opinion.  *Cruze v. Chater*, 85 F.3d 1320, 1325-26 (8th Cir. 1996)*;see Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ( "'[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague,

conclusory statements'") (quoting *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)); *Heino v. Astrue*, (a treating physician's opinion does not "'automatically control' in the face of other credible evidence on the record that detracts from that opinion") (quoting *Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999)); *McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011) ("An ALJ may reject a treating physician's opinion if it is inconsistent with the record as a whole") (citing *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008)).

Here, as to Plaintiff's physical impairments, the ALJ acknowledged Plaintiff's long history of low back and right ankle injuries but noted improvement with medication and physical therapy, and mild findings on x-rays and CT scans. (Tr. 18-19.) The ALJ also noted minimal objective findings on examination for Plaintiff's bilateral elbow and shoulder pain, and improvement with cortisone injections, although ultimately a tear was found in his right shoulder. (Tr. 19-22.) In May 2009, Plaintiff was discharged from physical therapy for noncompliance. (Tr. 21.)

In considering Plaintiff's course of treatment, the ALJ characterized Plaintiff's treatment as routine, conservative and generally successful. (Tr. 23.) The ALJ discounted Plaintiff's credibility regarding the severity of his symptoms because, on a number of occasions, Plaintiff failed to show for medical appointments and failed to follow up on recommendations. (*Id.*) The ALJ also noted the treatment records did not support Plaintiff's testimony that he suffered side effects from medication and that any motion caused him discomfort. (*Id.*) Plaintiff never reported these issues to his treating providers.

The ALJ rejected the opinions of Dr. Bammann, Physician Assistant Durdall and Therapist Broste because "their own reports" did not reveal the clinical or laboratory findings to support the limitations they imposed on Plaintiff, nor did they explain this deficiency. (*Id.*) The ALJ also rejected

Dr. Lewis' opinion that Plaintiff could not tolerate the stress of the workplace as inconsistent with the record. (*Id.*) In support, the ALJ cited the treating psychiatrist's notes that Plaintiff was stable on medication, and the evidence that Plaintiff engaged in activities such as repairing bikes, helping out at the family campground, helping his girlfriends with household projects, juggling relationships with six different women, and going to school full-time. The Court finds Plaintiff's success as a full-time student and his multiple other activities are inconsistent with Dr. Lewis' opinion that Plaintiff could not tolerate the stress of the workplace and Broste's opinion that Plaintiff had poor or no ability to maintain attention for a two-hour segment; sustain an ordinary routine without special supervision; perform at a competitive rate; and accept instructions and respond appropriately to criticism from supervisors. The ALJ granted greater weight to Dr. Ludeke's opinion [Tr. 638] and found that Plaintiff could perform low stress, routine tasks, with brief superficial contact with others. (Tr. 17, 23-24.) This opinion is more consistent with Plaintiff's actual activities than Broste's more limited RFC opinion. The Court also notes Plaintiff's social and emotional problems were complicated by alcohol abuse. (Tr. 500, 578, 655, 805, 870.) For example, in July 2009, Plaintiff seemed to be experiencing more depression, but he was using alcohol on a regular basis. (Tr. 821.)

The ALJ addressed Dr. Lesar's opinion that while Plaintiff was somewhat limited by disability, he was also somewhat limited in his ability to work because he had applied for disability and was waiting for a decision. (Tr. 24.) Similarly, the Court notes that in November 2007, Durdall cited "multifactorial" reasons for his opinion that Plaintiff could not maintain lasting employment. (Tr. 419.) The multifactorial reasons for Plaintiff's inability to maintain lasting employment might have included Plaintiff's alcohol use and his criminal record. (Tr. 612-13.) The ALJ also gave good reasons to discount the severity of Plaintiff's subjective complaints. Plaintiff told his therapist he was

untruthful about his activities [in reference to his multiple girlfriends] but he did not see himself living any other way. (Tr. 24.) And, Plaintiff denied using marijuana, but Dr. Bammann noted he smelled marijuana on Plaintiff that day. (*Id.*) The ALJ found Plaintiff's activities inconsistent with greater limitations than those imposed by the State agency physicians. (*Id.*)

In addition to the evidence cited by the ALJ, the Court finds the following evidence supports the ALJ's decision to grant greater weight to the State agency consultants' opinions over the treating providers' opinions. On January 27, 2009, Durdall supplied disability opinions to Plaintiff's home county and to the SSA. Durdall reported much greater limitations to the SSA than to the county in support of Plaintiff's claim for general assistance. (Tr. 646-50.) For example, Durdall told the county Plaintiff was restricted to lifting twenty pounds, but he told the SSA Plaintiff was restricted to lifting ten pounds occasionally and less than ten pounds frequently. Furthermore, Durdall never reported any sitting, handling, or fine fingering limitations to the county. Durdall's restrictions on Plaintiff's use of his arms are inconsistent with Plaintiff's activities. On one occasion, Plaintiff's chiropractor noted Plaintiff's subjective rating of his pain at a level eight out of ten appeared exaggerated, and a level three or four was more consistent with others who presented similarly to Plaintiff. (Tr. 659.) For all of these reasons, the Court finds substantial evidence in the record supports the ALJ's RFC finding.

### 3.     Hypothetical Question to the Vocational Expert

The ALJ relied on the VE's response to a hypothetical question that assumed Plaintiff had the physical and mental abilities that the ALJ found supported by the record. Because the Court finds the ALJ's RFC finding is supported by substantial evidence in the record as a whole, the ALJ did not err in relying on the VE's testimony of Plaintiff's ability to perform other work that exists in significant numbers in the economy. *See Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007) (ALJ

properly relied on VE's testimony based on a hypothetical question that contained all impairments supported by the record.)  Therefore, the Court recommends affirming the ALJ's decision.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.      Plaintiff's Motion for Summary Judgment (#17) **be denied.**

2.      Defendant's Motion for Summary Judgment (#24) **be granted;**

4.      The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**


DATED: December 18, 2012

<div style="margin-left:40%">

_s/ Franklin L. Noel_
FRANKLIN L. NOEL
Unites States Magistrate Judge

</div>


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 2, 2013**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.